OPINION
{¶ 1} Plaintiff-appellant, Lana Silcott, appeals a decision of the Clermont County Court of Common Pleas, Probate Division, granting judgment against two of her siblings, defendants-appellees, Roger and Robert Prebble.
 {¶ 2} Lowell Prebble had eight children: Lana, Roger, Robert, Phillip, Milton, Carol, Mark, and Donna. By power of attorney dated December 1, 1994, Lowell, age 77, designated Roger and Robert as his attorneys-in-fact. The power of attorney remained in effect until Lowell's death on March 3, 1998. On the day the power of attorney was granted, Lowell had a checking account with a balance of $1,743.35, and a savings account with a balance of $44,338. Lowell had monthly retirement income of $811.50 from General Motors (pension) and $714 from social security. Lowell received biweekly payments of $306.44 from the Bureau of Workers' Compensation until July 1997 when he received a lump sum of $15,934.88 in lieu of the biweekly payments. The pension and social security monthly payments continued until his death.
 {¶ 3} At the time the power of attorney was granted, Lowell also owned a house and a commercial building, which was being used by Lowell and his sons as a family business. During the last three or four years of his life, Lowell did not participate in the business but used it as a place to "hang out" and to occupy his retirement time. He derived no income from the business. Although he owned a house, Lowell only lived in it sporadically in 1994 and 1995. Instead, during those two years, Lowell either lived in a place he was renting or with his girlfriend in Kentucky. The record shows that at some point, Phillip lived in his father's house rent-free until a 1997 flood. The house was then briefly occupied by Robert, then left vacant, and eventually torn down. Robert has since rebuilt a house where his father's house once stood.
 {¶ 4} In 1994, Lowell started being forgetful. He was diagnosed on December 6, 1995 with Alzheimer's disease. On January 17, 1996, Lowell and Roger went to Lowell's bank where they opened a joint checking account with right of survivorship. By then, Lowell required full time care. Because he did not want to live in a nursing home, Lowell first lived with Roger from February to April 1996. After he could no longer care for his father, Roger tried to place him with other family members. He first offered to pay Lana $1,800 a month to care for their father, but she declined. In April 1996, Lowell was placed with Milton and his wife Patricia. Both Roger and Milton testified to an oral agreement to provide for Lowell's care for $3,200 a month. Lowell lived with Milton until February 1998, when he returned to Roger's house where he lived until he died on March 3, 1998.
 {¶ 5} During the 39-month period they handled their father's financial affairs as attorneys-in-fact, neither Roger nor Robert kept a record of the money received or expended. The only record of expenditure made by Roger and Robert consists of several canceled checks and withdrawal slips without any or adequate documentation or explanation as to their use or purpose. Although Roger and Milton both testified Milton orally agreed to care for his father for $3,200 a month, no formal agreement was ever entered between the two brothers. While there are copies of checks in varying amounts to either Milton or his wife, there are no monthly checks of $3,200 to support the brothers' oral agreement. Both Milton and Roger testified that Milton was often paid with Lowell's pension and workers' compensation checks. At times, Milton was also paid with money from the savings account. The record shows that two to three months before Lowell's death, the balance of the savings account was down to $334.51. The record also shows that in July 1997, Milton received the workers' compensation lump sum check of $15,934.88 in its entirety as past and future payment for his father's care.
 {¶ 6} In January 2000, Lana filed a complaint for (1) an accounting of Lowell's estate, (2) a declaratory judgment to determine the proper owners of the assets transferred by Roger and Robert via their power of attorney, (3) concealment by appellees of assets belonging to the estate, and (4) intentional interference by Roger and Robert with Lana's expectancy of inheritance. The complaint was filed against Roger and his wife Sharon, Robert, Milton and his wife Patricia, Phillip and his wife Janice, and Carol. The record shows that during the power of attorney, all those appellees received money from Lowell's assets.[1]
 {¶ 7} Following a hearing on the matter, the probate court issued the following decision/entry:
 {¶ 8} "Based upon the testimony of Dr. Rorick, I find by clear and convincing evidence that on December 6, 1995, and until his death, Lowell Prebble was incompetent and lacked the mental capacity to establish a valid survivorship account with his son on Jan. 17, 1996. *** The account being invalid, the attorneys-in-fact's responsibility to account for any monies in or transferred to the account continued until Lowell's death. ***
 {¶ 9} "*** Based upon the evidence presented in this case it is impossible for the Court to find or create an accurate accounting in this case. The Court, in an effort to make an equitable accounting in this case makes the following findings:
 {¶ 10} "1. To provide for the care, maintenance and support of Lowell Prebble from Dec. 1, 1994, until he required full time care in March 1996, I find it was necessary to use his entire monthly retirement income of approximately $2,189.00 plus any interest income received or imputed to his savings. Between March 1996 and his death on March 3, 1998, I find he required full time care outside his residence and the reasonable cost of this care was $3,000.00 per month for a total of $72,000.00. During this 24 month period[,] the income from his retirement including a lump sum payout from workmans' [sic] compensation was approximately $63,000.00 This would require an invasion of Lowell Prebble's savings of $9,000.00.
 {¶ 11} "2. The Court will not consider any expenditure of funds for the upkeep of the properties while Lowell was not in residence as they would be the responsibility of the occupying parties. The Court will not impose a rental obligation on the properties up to the death of Lowell Prebble.
 {¶ 12} "3. The Court finds that Milton and Patricia Prebble have no claim against the estate of Lowell Prebble for monies due, if any, for the care they provided. Any claim they may have would be against Roger and Robert Prebble.
 {¶ 13} "4. The Court finds the only justification the defendants' attorneys-in-fact have for invading Lowell Prebble's Savings as existing on Dec. 1, 1994, for his care, support and expenditure for the maintenance and upkeep of his properties was $9000.00 during the period from March, 1996 to the date of his death. ($44,338 plus $1,743.00 less $9,000.00)
 {¶ 14} "A judgment is rendered to the estate of Lowell Prebble against Robert Prebble and Roger Prebble in the amount of $37,081.00 plus interest at 5% per annum from March 3, 1998."
 {¶ 15} Lana now appeals and raises five assignments of error which will be addressed out of order. Before we address them, however, we note that the complaint filed by Lana in the probate court set forth four causes of action. In its decision/entry, the probate court seemingly only ruled on the accounting cause of action, then proceeded to resolve the case at hand. On appeal, Lana does not challenge the probate court's failure to explicitly rule on the other causes of action.
 {¶ 16} In her fourth assignment of error, Lana argues that the probate court erred by not following the statutory procedures regarding concealed assets.
 {¶ 17} R.C. 2109.50 creates a special proceeding which enables interested parties to recover concealed, embezzled, and conveyed assets of an estate. See In re Estate of Coleman (1988), 55 Ohio App.3d 261. However, the statute is not intended as a substitute for a civil action to collect a debt, obtain an accounting, adjudicate rights under a contract, or recover judgment money owing an executor or administrator.Ukrainiec v. Batz (1982), 24 Ohio App.3d 200, 202.
 {¶ 18} The proceeding is initiated by filing a complaint with the probate court having jurisdiction over the administration of the estate. R.C. 2109.50. Upon the filing of the complaint, the probate court is required to issue a citation to the person(s) suspected of concealing or embezzling the assets belonging to the estate. Id. The probate court is then directed to proceed to hear and determine the matter forthwith. Id. The parties and witnesses are to be examined with the questions and answers reduced to writing and signed by the person testifying. Id. However, the requirement that the questions and answers of the party and witnesses examined be reduced to writing and signed by those who have testified, is directory and not mandatory. Sheets v. Hodes (1944),142 Ohio St. 559, 565-566.
 {¶ 19} Although Lana broadly asserts that the probate court failed to follow R.C. 2109.50, she fails to specifically show how and where exactly the probate court failed to comply with the statute. The record shows that a hearing was held before the probate court during which three of the eight appellees listed in Lana's complaint testified. App.R. 16(A)(7) requires an appellant's brief to contain "the contentions of the appellant with respect to each assignment of error *** and the reasons in support of the contentions, with citations to *** parts of the record on which appellant relies." Thus, an appellant must indicate to the appellate court specifically where the trial court's alleged errors may be located. "It is not the duty of an appellate court to search the record for evidence to support an appellant's argument as to any alleged error."State v. Watson (1998), 126 Ohio App.3d 316, 321. Lana's fourth assignment of error is accordingly overruled.
 {¶ 20} We now turn to Lana's other assignments of error. We note that while they each challenge a specific and different portion of the probate court's decision, they all essentially challenge the probate court's decision as being against the manifest weight of the evidence and/or not supported by sufficient evidence. In reviewing the probate court's decision, this court is mindful that the probate court was in the best position to judge the credibility of the witnesses and the weight to be given the evidence. See Seasons Coal Co., Inc. v. Cleveland (1984),10 Ohio St.3d 77. For this reason, this court is guided by the presumption that the findings of the probate court are correct. In reScott (1996), 111 Ohio App.3d 273, 276.
 {¶ 21} In her first assignment of error, Lana argues that the probate court erred by imputing living expenses for Lowell during the 39-month period covered by the power of attorney. The probate court first imputed living expenses of $2,189 per month during the time period Lowell lived on his own (December 1994 to February 1996), then imputed living expenses of $3,000 for the two (and final) years of his life he lived with Milton. Lana asserts that the probate court's decision to impute living expenses was against the manifest weight of the evidence. Lana also asserts that Roger did not have authority to pay Milton for the care of their father.
 {¶ 22} A probate court has "plenary power at law and in equity to dispose fully of any matter that is properly before the court[.]" R.C.2101.24(C). A power of attorney is a written instrument authorizing an agent to perform specific acts on behalf of his principal. Testa v.Roberts (1988), 44 Ohio App.3d 161, 164. The holder of a power of attorney has a fiduciary relationship with the principal. See Brooks v.Bell (Apr. 10, 1998), Hamilton App. No. C-970548. This relationship is "one in which special confidence and trust is reposed in the integrity and fidelity of another." In re Scott, 111 Ohio App.3d at 276. A general power of attorney does not authorize a fiduciary to give away the principal's property to the fiduciary or others. To authorize gifts to the fiduciary, the power of attorney must explicitly confer this power. Id. In addition, the person who holds the power bears the burden of proof on the issue of the fairness of the transaction. Id.
 {¶ 23} During the time period he lived on his own, Lowell received monthly retirement income of $811.50 from his pension and $714 from social security, as well as biweekly payments of $306.44 from workers' compensation. We see no error in the probate court's imputation of living expenses of $2,189 per month during that period when Lowell was receiving $2,138.38 per month.
 {¶ 24} Then, in February 1996, Lowell went to live with Roger for a couple of months before he went to live with Milton. By then, Lowell required full time care. Although both Roger and Milton testified to an oral agreement to provide for Lowell's care for $3,200 a month, the probate court found that there was no formal agreement between the two brothers. The probate court also found that there were no monthly checks of $3,200 to support the brothers' oral agreement.
 {¶ 25} The probate court nevertheless imputed living expenses of $3,000 a month. Although Roger had not looked into what it would have cost to put Lowell in a nursing home for the final two years of his life, Roger did testify that a nursing home had cost $3,200 a month in September 1996 when Lowell had to be placed in the nursing home because of a broken hip. Testimony before the trial clearly showed that Lowell adamantly did not want to live in a nursing home, but rather, wanted to be cared for by his family. Roger testified that while his father did not tell him how to do it, he asked Roger to take care of him and told him he could have his money if Roger took care of him. Upon thoroughly reviewing the record, we find no error in the probate court's imputation of $3,000 in living expenses for Lowell's care during the last two years of his life.
 {¶ 26} Lana nevertheless argues that Roger had no authority to pay Milton for their father's care and cites Hinkle v. Sage (1902),67 Ohio St. 256 in support of her argument. In Hinkle, the plaintiff sought compensation for services rendered to a relative. The Ohio Supreme Court held that "[i]n an action to recover compensation for services, when it appears that the plaintiff was a member of the family of the person for whom the services were rendered, no obligation to pay for the services will be implied; and the plaintiff cannot recover in such case unless it be established that there was an express contract upon the one side to perform the services for compensation, and upon the other side to accept the services and pay for them." Id. at paragraph one of the syllabus.
 {¶ 27} We find that the foregoing doctrine is inapplicable for two reasons. First, unlike in Hinkle, the case at bar does not involve an action by Roger to recover compensation for the care of his father. Rather, in his effort to make an equitable accounting of Lowell's assets prior to death, the probate court imputed living expenses for both the time he lived on his own and the time he lived with his sons. While the doctrine may have been applicable to Milton's claim for monies due for his father's care, the probate court expressly found that Milton and his wife had no such claim against Lowell's estate. Second, it is well-established that the doctrine applies "only to a claim against one who is sui juris, for it would be absurd to require a contract with one incapable of making it." Scattergood v. Ingram (1912), 86 Ohio St. 76,79; Markland v. Harley (1958), 107 Ohio App. 245.
 {¶ 28} In light of all of the foregoing, we find no error in the probate court's imputation of living expenses for Lowell from December 1994 to March 1998. Lana's first assignment of error is overruled.
 {¶ 29} In her second assignment of error, Lana argues that the probate court erred by not allowing her to ask Robert's opinion as to the fair rental value of Lowell's house and commercial building. In her third assignment of error, Lana argues that the probate court erred by failing to hold Roger and Robert, the attorneys-in-fact, accountable for their failure to charge or pay rent for Lowell's house and commercial building.
 {¶ 30} At the time the power of attorney was granted to Roger and Robert, Lowell owned a house and a commercial building which was and had been used for years as a family business by Lowell and his sons. The record shows that at some point, Phillip, another son, lived in his father's house rent-free until 1997. The house was then briefly occupied by Robert who had purchased it by then, then left vacant, and eventually torn down. On cross-examination, Robert was asked whether $1,000 to $1,500 would have been a fair monthly rental value for both properties. Robert replied it was not as the house, a 40 by 30 cinder block building with plywood floors, had been found to be uninhabitable by an appraiser. With regard to the commercial building, Robert testified it had appraised at $29,000. The record shows that Robert had been running the family business in that building all his life and that he was employing Roger and Phillip.
 {¶ 31} Roger and Robert both admitted they had never charged or paid rent for either the house or the commercial building. Roger denied that failing to charge rent for either property was contrary to his father's financial interest, as he had done what his father wanted. Robert testified that rent for the commercial building "was never an issue to [them] because that was never, never, ever into the equation." Robert also testified that he had made a deal with his father: in exchange for giving Phillip a job and taking care of him, all Robert had to do was to pay the taxes on the business. Phillip, in turn, could live in the house and pay the taxes on the house.
 {¶ 32} Charles Beiser, Lowell's best friend, confirmed that Roger, Robert, and Milton all worked at the family business and that Phillip lived in the house. Beiser testified that Lowell wanted Phillip to live in the house rent-free. Beiser explained that Phillip was Lowell's pride and joy and that he wanted Phillip to be taken care of regardless of what happened. Beiser further testified that Robert and Lowell had a partnership relationship in the business and that they took care of one another.
 {¶ 33} We note that while Lana criticizes the probate court for not allowing her to ask Robert's opinion as to the fair rental value of Lowell's house and commercial building, she herself has failed to produce any evidence as what the fair rental value of both or either property would have been. Upon thoroughly reviewing the record, and in light of the foregoing, we find no error in the probate court's failure (1) to press Robert as to a fair rental value, and (2) to hold both Roger and Robert accountable for their failure to charge or pay rent. Lana's second and third assignments of error are overruled.
 {¶ 34} In her fifth assignment of error, Lana argues that the probate court erred by awarding judgment only against Roger and Robert, the attorneys-in-fact. Lana argues that judgment should also have been entered against the other six appellees for receiving funds improperly from the attorneys-in-fact. We disagree. Unlike Roger and Robert, the other six appellees were not attorneys-in-fact in charge of Lowell's assets. In addition, although claiming in her complaint that all of appellees had concealed, embezzled, or conveyed away $126,800, Lana failed to produce any evidence to trace any assets to those six appellees. It is well-established that in a proceeding for concealment of assets, the burden of proof is upon the complainant to establish a prima facie case by direct evidence. Maag, Troy, and Barlow, 2002 Ohio Probate Practice and Procedure, 144, Section 12.08; see, also, In re Estate of Woods
(1959), 110 Ohio App. 277. Lana has failed to meet her burden. Lana's fifth assignment of error is accordingly overruled.
Judgment affirmed.
WALSH, P.J., and POWELL, J., concur.
[1] 1. When referred together as a group, Roger, Sharon, Robert, Milton, Patricia, Phillip, Janice, and Carol will be referred to as appellees. When referred to individually, however, each appellee will be referred to by his or her first name.